UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

MIGUEL JOSE GUITRON,

                          Petitioner,

     v.

RENEE BAKER, *et al.,*

                    Respondents.

Case No. 3:18-cv-00235-MMD-CLB

ORDER

## I.  INTRODUCTION

This action is a petition for writ of habeas corpus by Petitioner Miguel Jose Guitron, an individual incarcerated at Nevada's Lovelock Correctional Center ("NLCC"). Petitioner is represented by appointed counsel. Respondents have filed an answer to Petitioner's amended habeas petition and Petitioner has filed a reply, and the case is before the Court for resolution on the merits of Petitioner's claims. The Court will deny Petitioner's Petition and certificate of appealability and will direct the Clerk of the Court to enter judgment accordingly.

## II.  BACKGROUND

In its opinion on Petitioner's direct appeal, the Nevada Court of Appeals described the factual background of the case as follows:

> Guitron met the victim's mother, Anita, in Las Vegas in 1997 or 1998. The couple dated for some time, after which Anita moved to Michigan. When she left Las Vegas, Anita was approximately two to three months pregnant with the victim, who she asserts is Guitron's child. However, Anita did not tell Guitron she was pregnant and she had no contact with Guitron for some years after leaving Las Vegas. When the victim was five years old, Anita applied for child support from Guitron, which the court awarded following a positive paternity test.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In October 2010, Guitron called Anita while she was living in Ohio with the victim and her two other children fathered by another man. The victim, who was then 11 years old, overheard the conversation, realized it was her father on the phone, and asked to speak with him. The victim testified that during this first telephone conversation, Guitron told her he was her father. Anita described the victim as "a kid in a candy store" upon speaking with her father for the first time.

Following this phone call, Anita moved back to Las Vegas in late 2010 and resumed her relationship with Guitron. The victim, who was in elementary school and enrolled in an Individualized Education Plan because she was a slow learner, was thrilled to finally meet her father. Guitron began living with the family shortly after the move. During this time, the victim discussed sex with Anita and had at least some knowledge and understanding of sex.

When the victim was 12 years old, Anita realized the victim was pregnant. Initially, the victim told Anita a neighbor boy was the father. The next day, Anita took the victim to a pregnancy center where medical personnel confirmed she was eight months pregnant. Based on the victim's statements during the examination, the medical staff called the police and alleged Guitron had sexually assaulted the victim. The victim then admitted to both Anita and the police that Guitron was the baby's father. She explained she initially lied because Guitron told her to say the neighbor boy was the father. DNA testing by the Las Vegas Metropolitan Police Department conclusively proved Guitron was the father of the victim's baby. Additionally, Guitron sent letters to the victim during the pendency of the case, openly admitting he was the baby's father.

At trial, based on his statement during an interview to detectives prior to his arrest, Guitron asserted he and the victim only engaged in sex on one occasion. Further, he alleged the victim initiated that single sexual encounter, which occurred while Guitron was intoxicated and partially unconscious. Guitron argued the victim was sexually curious and wanted to have sex with him, and she was capable of understanding the consequences of her actions despite her age, He also asserted the State did not meet its burden of proof on the incest charge because the State did not present DNA evidence proving he was the victim's father. The State countered with evidence Guitron had groomed the victim and engaged in sexual conduct with her on multiple occasions, even when the victim resisted his advances. The State also presented witness testimony that Guitron was the victim's father.

The jury convicted Guitron of incest, four counts of sexual assault with a minor under the age of 14, and two counts of lewdness with a child under the age of 14.

(ECF No. 25-35 at 3-5.) Petitioner was sentenced as follows:

Count 1, incest, life in prison with the possibility of parole after two years;

Count 2, sexual assault with a child under the age of 14, life in prison with the possibility of parole after 35 years, consecutive to the sentence on Count 1;

2

Count 4, sexual assault with a child under the age of 14, life in prison with the possibility of parole after 35 years, concurrent with the sentence on Count 2;

Count 6, sexual assault with a child under the age of 14, life in prison with the possibility of parole after 35 years, concurrent with the sentence on Count 4;

Count 8, sexual assault with a child under the age of 14, life in prison with the possibility of parole after 35 years, concurrent with the sentence on Count 6;

Count 10, lewdness with a child under the age of 14, life in prison with the possibility of parole after 10 years, consecutive to the sentence on Count 8; and

Count 11, lewdness with a child under the age of 14, life in prison with the possibility of parole after 10 years, concurrent with the sentence on Count 10.

(ECF No. 25-2 at 3.) The judgment of conviction was filed on October 8, 2013. (*Id.*)

Petitioner appealed, and the Nevada Court of Appeals affirmed the judgment of conviction on May 21, 2015. (ECF No. 25-35.)

Petitioner filed a *pro se* petition for writ of habeas corpus in the state district court on June 9, 2016. (ECF Nos. 26-5, 26-6.) Subsequently, counsel was appointed, and, with counsel, Petitioner supplemented his petition. (ECF No. 26-23.) The state district court denied Petitioner's petition on January 25, 2017. (ECF No. 26-27.) Petitioner appealed, and the Nevada Supreme Court affirmed on January 10, 2018. (ECF No. 26-43.)

This Court received Petitioner's original *pro se* habeas petition, initiating this action, on May 22, 2018. (ECF No. 7.) The Court appointed counsel to represent Petitioner (ECF No. 6), and, with counsel, Petitioner filed an amended habeas petition on February 20, 2019 (ECF No. 19). Petitioner's amended petition includes the following claims:

Ground 1: "There was insufficient evidence produced at trial to establish beyond a reasonable doubt that Mr. Guitron was guilty of sexual assault with a minor under 14 years of age." (ECF No. 19 at 9.)

Ground 2: "The court violated Mr. Guitron's constitutionally guaranteed right to due process when it denied his motion to admit evidence relating to the alleged victim's sexual knowledge." (*Id.* at 13.)

1
2

Ground 3: "The trial court violated the equal protection clauses of the United States and Nevada Constitutions by denying challenges to discriminatory practices prohibited by *Batson v. Kentucky*." (*Id.* at 19.)

3
4
5

On May 14, 2019, Respondents filed a motion to dismiss (ECF No. 23), arguing that Petitioner's claims are barred by the statute of limitations. The Court denied that motion on October 25, 2019. (ECF No. 31.)

6
7

Respondents filed an answer on February 20, 2020. (ECF No. 34.) Petitioner filed a reply on June 1, 2020. (ECF No. 41.)

8

III.   **DISCUSSION**

9

   **A.   Standard of Review**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a petition for a writ of habeas corpus on any claim that was adjudicated on its merits in state court unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. *See* 28 U.S.C. § 2254(d). A state-court ruling is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state-court ruling is "an unreasonable application" of clearly established federal law under Section 2254(d) if it correctly identifies the governing legal rule but unreasonably applies the rule to the facts of the case. *See Williams v. Taylor*, 529 U.S. 362, 407-08 (2000). To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court precedent was "objectively unreasonable." *Id.* at 409-10; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Or, in other words, habeas relief is warranted, under the "unreasonable application" clause of Section 2254(d), only if the state court's ruling was "so lacking in justification

28

1    that there was an error well understood and comprehended in existing law beyond any
2    possibility for fair minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

3    **B.    Ground 1**

4         In Ground 1, Petitioner claims that his federal constitutional rights were violated
5    because there was insufficient evidence produced at trial to establish beyond a
6    reasonable doubt that he was guilty of sexual assault with a minor under 14 years of age.
7    (ECF No. 19 at 9-13.)

8         Petitioner asserted this claim on his direct appeal. (ECF No. 25-17 at 15-16.) The
9    Nevada Court of Appeals ruled as follows:

10            ...In reviewing a challenge to the sufficiency of the
         evidence, we view the evidence in the light most favorable to
11        the prosecution and determine whether "any rational trier of
         fact could have found the essential elements of the crime
12        beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.
         307, 319 (1979) (emphasis omitted); *Mitchell v. State*, 124
13        Nev. 807, 816, 192 P.2d 721,727 (2008). As "it is the function
         of the jury, not the appellate court, to weigh the evidence and
14        pass upon the credibility of the witness," *Walker v. State*, 91
         Nev, 724, 726, 542 P.2d 438, 439 (1975), we do not determine
15        the defendant's guilt, but rather consider "whether the jury,
         acting reasonably, could have been convinced [beyond a
16        reasonable doubt] by the evidence it had a right to consider,"
         *Wilkins v. State*, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).
17        The jury determines the weight and credibility of conflicting
         testimony, and we will not disturb the jury's verdict where
18        substantial evidence supports the jury's findings. *See*
         *Shannon v. State*, 105 Nev. 782, 791, 783 P.2d 942, 947
19        (1989); *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20
         (1981); *see also McNair v. State*, 108 Nev. 53, 56, 825 P.2d
20        571, 573 (1992).

21                              *   *   *

22            We next turn to the question of whether the evidence
         supported the jury's verdict finding Guitron guilty of sexual
23        assault with a minor under the age of 14. As relevant to this
         appeal, NRS 200.366 defines sexual assault as occurring
24        where a person "subjects another person to sexual
         penetration … against the will of the victim or under conditions
25        in which the perpetrator knows or should know that the victim
         is mentally or physically incapable of resisting or
26        understanding the nature of his or her conduct." Guitron
         argues he should not have been convicted on this charge
27        because the evidence showed the victim consented to having
         sex, and did not support the jury's finding Guitron knew or
28

                                    5

should have known the victim did not understand the consequences of her conduct.

At trial, Guitron did not dispute he and the victim had sexual intercourse or the victim's baby was his child. Instead, Guitron asserted he had committed a lesser crime of statutory sexual seduction. The victim testified at trial that she was in love with Guitron and Guitron was in love with her. Guitron's counsel argued to the jury the victim initiated sex by climbing on top of him while he was intoxicated because she was curious about sex and wanted to know what a penis felt like inside of her vagina.

The State, however, countered that this victim was vulnerable and unable to understand the consequences of her actions. Further, because of the victim's age and vulnerability, Guitron intentionally manipulated the victim into having sex with him. The State presented evidence the victim was "like a kid in a candy store" the first time she spoke with Guitron on the telephone, as she was excited to meet the father she had never known. Anita, her mother, testified the victim was a slow learner and was in a special program at school, which required the victim to have an Individualized Education Plan. During the time Guitron lived with the victim and her family, he groomed the victim by telling her he loved her, he wanted to marry her, and he wanted to spend the rest of his life with her. The victim testified at one point Guitron gave her a diamond ring and told her he wanted to marry her. When the victim gave the ring back, Guitron swallowed the ring. Thereafter, Guitron left her a teddy bear with his ring around the bear's neck. The victim took the necklace from the bear's neck and began to wear his ring on a necklace. Ultimately, the 12-year-old victim fell in love with Guitron, a man in his mid-40s.

The State also presented evidence the victim was initially reluctant to have sex with Guitron for fear of getting pregnant. The victim testified Guitron began having sexual intercourse with her around November or December 2011, when she was 12 years old. She testified she did not initiate sex with Guitron. Instead, she testified to several specific instances where Guitron had pressured her into having sex with him, and at least one occasion where she voiced her concern to Guitron about becoming pregnant. The victim also told the jury they had engaged in sex more than ten times.

The State argued the victim was not capable of understanding her actions due to her age and immaturity, and. thus she was incapable of giving consent. She did not know how to prevent pregnancy: she took One-A-Day vitamins because she believed they would prevent pregnancy and did not use condoms. A caseworker testified the victim did not know how to adequately care for a newborn, and the victim was initially more concerned about continuing her relationship with Guitron than about trying to understand her situation as a parent. These facts support the State's position that this victim was not prepared for pregnancy, did not understand

6

1

> how to prevent it, and did not understand the stigma associated with having her father's baby.

2

3

> Therefore, the record reflects sufficient evidence supporting the verdict Guitron was guilty of sexual assault with a minor under the age of 14. The State presented sufficient evidence for a rational trier of fact to conclude the victim did not understand the consequences of her actions, she was incapable of giving her consent, and Guitron knew or should have known the victim was mentally or physically incapable of resisting his conduct when he engaged in sex with her. *See Jackson*, 443 U.S. at 319; *Shannon*, 105 Nev. at 790-91, 783 P.2d at 947 (citing NRS 200.366).

4

5

6

7

8

(ECF No. 25-35 at 8-11.)

9

10

11

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The Nevada Court of Appeals correctly applied the *Jackson* standard. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis omitted); *see also Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). "[F]aced with a record of historical facts that supports conflicting inferences," the court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). The Supreme Court has noted that claims of insufficiency of the evidence "face a high bar in federal habeas proceedings. . . ." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Here, viewing the evidence in the light most favorable to the prosecution, there was ample evidence supporting Petitioner's conviction of sexual assault with a victim under the age of 14. The victim testified as follows regarding the first sexual contact that Petitioner had with her:

27

> Q.    Can you tell me how that started?

28

7

1

> A.     It was like before kissing. It was just me, him and my sister home. My brother is out with his friend, like going to the park. My mom was at work. It would just be me and him and my mom's friend. We were watching TV that day. And then it led to kissing. And then he asked me to put his privacy in my mouth.

2

3

> Q.     How did you feel about that?

4

> A.     I don't know.

5

> Q.     Did you do it?

6

> A.     Yes.

7

> Q.     Did you tell him you didn't want to do it?

8

> A.     Yes.

9

> Q.     How did he react when [you] said you didn't want to do it?

10

> A.     He did it.

11

(ECF No. 24-30 at 16.) The victim also testified, as follows, about another time:

12

> A.     In my mom's bedroom we were playing one of his video games and he brung (sic) up the incident of having sex with him and he wanted to do it again. And I was like, no, I'm okay. And he kept pushing and pushing until I finally gave in.

13

14

15   (*Id.*) The victim testified that Petitioner had sex with her more than 10 times (*Id.*) This

16   testimony of the victim, along with other evidence presented at trial, was plainly sufficient

17   for a rational trier of fact to find that Petitioner subjected the victim to sexual penetration

18   against her will or under conditions in which he knew or should have known that she was

19   mentally or physically incapable of resisting or understanding the nature of her conduct.

20   (ECF Nos. 24-30 at 12 (victim's testimony regarding her date of birth); 14 (victim testified

21   she was "so excited" to meet her father, and "couldn't wait to see him"); 15, 17 (victim

22   testified that Petitioner told her that he loved her and wanted to spend the rest of his life

23   with her); 17 (victim testified that Petitioner gave her a diamond ring, "[f]or [her] to marry

24   him," but she gave it back, and Petitioner swallowed it; victim testified that Petitioner later

25   gave her a ring, which she wore on a necklace); 17 (victim testified that she took One-A-

26   Day vitamins to try to prevent pregnancy, and that Petitioner did not use condoms); 18

27   (victim testified that Petitioner told her not to tell her mother that they were having sex);

28   21 (victim testified that she and Petitioner began having sex in December 2011, when

8

1    she was 12 years old); 24-32, at 7 (victim's mother's testimony regarding victim's date of

2    birth); 8 (victim's mother testified that victim was "like a kid in a candy store" when

3    Petitioner called for the first time; victim's mother described victim's first meeting with her

4    father); 11 (victim's mother testified that victim was a slow learner, and had an

5    Individualized Education Plan).)

6         It was clearly reasonable for the Nevada Court of Appeals to conclude that there

7    was sufficient evidence for the jury to find, beyond a reasonable doubt, that Petitioner

8    was guilty of sexual assault with a minor under 14 years of age. The Nevada Court of

9    Appeals' denial of relief on this claim was not contrary to, or an unreasonable application

10   of *Jackson*, or any other Supreme Court precedent, and was not based on an

11   unreasonable determination of the facts in light of the evidence presented. The Court will

12   deny Petitioner's habeas corpus relief on Ground 1.

13        **C.    Ground 2**

14        In Ground 2, Petitioner claims that his federal constitutional rights were violated

15   because the trial court denied his motion to admit evidence relating to the victim's sexual

16   knowledge. (ECF No. 19 at 13-14.) The evidence at issue here is evidence that the victim

17   had viewed internet pornography some time before Petitioner began having sex with her.

18   (*Id.*) Petitioner's position is that this evidence was relevant to his defense that the victim

19   initiated sex with him, because she knew about sex after viewing internet pornography

20   and wanted to know what it felt like, and that this evidence would have showed that she

21   understood the consequences of her actions and consented to sexual intercourse. (*Id.*)

22        Petitioner moved, before trial, for admission of the evidence. (ECF Nos. 24-15; 24-

23   20; 24-21 at 9-11; 24-24 at 14-15.) The trial court denied the motion to admit the evidence.

24   (ECF No. 24-24 at 14-15.) Petitioner then asserted this claim on his direct appeal. (ECF

25   No. 25-17 at 16-20.) There, Petitioner claimed that the exclusion of evidence violated his

26   rights under both Nevada law the federal constitution. (*Id.* at 20 ("This evidence was

27   admissible, and Nevada law, due process and the right of confrontation required the Court

28   to allow Mr. Guitron to introduce evidence of [the victim's] sexual knowledge.").) The

1   Nevada Court of Appeals denied Petitioner relief on these claims. (ECF No. 25-35 at 11-

2   18.)

3          The Nevada Court of Appeals explained that Nevada's "rape shield law," Nev. Rev.

4   Stat. § 50.090, "limits the degree to which a defendant may inquire into the victim's past

5   sexual history," but, under *Summitt v. State*, 101 Nev. 159, 697 P.2d 1374 (1985), in order

6   to square the rape shield law with the defendant's federal constitutional rights, there is an

7   exception, "where the defense uses such evidence *not to advance a theory of the victim's*

8   *general lack of chastity*, but to show knowledge or motive." (*Id.* at 11-12 (emphasis in

9   original) (citing *Summitt*, 101 Nev. at 163-64).) The Nevada Court of Appeals explained

10  that, under *Summitt*, the question whether such evidence is admissible involves a

11  weighing of the probative value of the evidence against its prejudicial effect. (*Id.* at 12-

12  13.)

13         The Nevada Court of Appeals described, as follows, the proceedings in the trial

14  court that led to the exclusion of the subject evidence in this case, and the trial court's

15  error in excluding the evidence:

16             Here, the district court held a hearing prior to trial regarding the
       defendant's motion in limine. Guitron made an offer of proof the victim had
17     obtained prior sexual knowledge by watching Internet pornography with one
       of her friends and her knowledge was relevant to rebut the State's theories
18     the victim did not consent and Guitron knew the victim was mentally
       incapable of consenting to having sexual intercourse. Further, Guitron
19     argued this evidence was relevant to support his statement to the police that
       this victim was curious about sex and had actually initiated sex with him. If
20     admitted, Guitron argued, this evidence would be probative to his defense
       of statutory sexual seduction and would rebut the State's theory this case
21     involved sexual assault. In response, the State presented almost no
       argument except to assert evidence that the victim's prior sexual knowledge
22     was irrelevant because the victim had the defendant's baby and the pair
       clearly engaged in sex. The State never expressly addressed Guitron's
23     defense.

24             The district court's subsequent ruling denying the defendant's motion
       was flawed under *Summitt*. The district court failed to explain its findings in
25     light of the defense theory in this case and made no findings regarding the
       probative value of the evidence. Instead, the court summarily denied
26     Guitron's motion, finding this evidence was too prejudicial.

27  (*Id.* at 14.) The Nevada Court of Appeals explained that the issue in this case was

28  "whether this victim was incapable of understanding the consequences of her actions (the

State's theory) or whether the victim consented to having sex with Petitioner (the defendant's theory)," and pointed out that Petitioner "did not seek to admit evidence that the victim had watched Internet pornography to muddy the victim's reputation or to attack her credibility; rather, he sought to bolster his defense through the statement he made to police that this victim had prior knowledge of sex, wanted to experience sex as a result of her curiosity, and consented to have sex with him." (*Id.* at 15.) The court ruled that "under the analysis set forth in *Summitt*, this evidence was relevant to his defense of statutory sexual seduction and was more probative than prejudicial considering the facts of this case." (*Id.* at 15.) The court continued, "accordingly, the district court abused its discretion and erred by denying the defendant's motion to admit evidence of the victim's past sexual knowledge. Furthermore, the district court made inadequate findings regarding the admission of this evidence." (*Id.* at 16.) The court then went on to clarify the procedure under Nevada law for "submitting and admitting or denying evidence of a victim's prior sexual knowledge." (*Id.*)

Regarding the effect of the error in this case, the Nevada Court of Appeals ruled as follows:

> Despite the lack of findings by the district court in this case, we nevertheless affirm Guitron's conviction because the district court's error was harmless. unlike the facts in *Summitt*, where a six-year-old alleged sexual assault and no admitted facts provided an alternate basis for the child's knowledge of sexual conduct, the facts in this case are notably distinguishable. Specifically, although Guitron was precluded from presenting evidence regarding the victim's conduct of viewing Internet pornography, the district court allowed Guitron to present evidence and argue the victim was knowledgeable about sex prior to having sexual intercourse with Guitron.

> Here, the 12-year-old victim admitted at trial she had knowledge about sexual conduct prior to having sex with Guitron. In fact, she explained to the jury she had conversations with her mother about sex, she knew about the birds and the bees, and she knew where babies came from. She even elaborated she told Guitron not to ejaculate inside of her vagina because she did not want to get pregnant. Anita confirmed this testimony and even told the jury the victim stated she was the one who initiated sex with Guitron.

> During closing arguments, defense counsel analogized the victim to other teenage girls starring in the MTV reality show *16 and Pregnant*. Defense counsel argued the victim was knowledgeable about sex,

1
2
3
4
5
6

understood the consequences of her actions, consented to and initiated sex, was in love with Guitron, and wanted to continue the romantic relationship. The defense urged the jury to disregard the state's theory that this crime was a sexual assault under conditions in which Guitron knew or should have known the victim was mentally or physically incapable of resisting his conduct. Finally, the district court specifically instructed the jury on statutory sexual seduction, and provided this charge as an alternative option for the jury's consideration on the verdict form. Therefore, the record overwhelmingly reflects Guitron was not precluded from advancing the defense theory that Guitron committed the lesser offense of statutory sexual seduction as opposed to sexual assault of a minor.

7
8
9

Given the overwhelming evidence supporting the verdict in this case, and the fact that Guitron was not precluded from advancing his defense to the jury, we conclude the district court's error did not contribute to the jury's verdict and was therefore harmless. Accordingly, we will not overturn the jury's verdict despite the district court's error.

10
(*Id.* at 16-18.)

11   A federal writ of habeas corpus is available under 28 U.S.C. § 2254 only for a
12   violation of federal law. *See Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985);
13   *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). Habeas relief is not available in
14   federal court for alleged error in the interpretation or application of state law. *See*
15   *Middleton*, 768 F.2d at 1085; *see also Lincoln v. Sunn*, 807 F.2d 805, 814 (9th Cir. 1987).
16   Therefore, to the extent that the Nevada Court of Appeals' ruling was a matter of state
17   law—for example, concerning the procedure for application of Nevada's rape shield law—
18   it is beyond the scope of this Court's habeas review.

19   With respect to Petitioner's federal constitutional claim, the Nevada Court of
20   Appeals ruled that any error was harmless beyond a reasonable doubt, because
21   Petitioner had the opportunity to, and did in fact, present evidence that the victim had
22   prior sexual knowledge. The court described, as follows, the standard of harmlessness
23   that it applied:

24
25
26
27

A court's error will not be grounds for reversal where it does not affect the defendant's substantial rights, NRS 178.598, and even if the error is a constitutional violation, the guilty conviction may still stand if the error was harmless beyond a reasonable doubt. *Obermeyer v. State*, 97 Nev. 158, 162, 625 P.2d 95, 97 (1981). To be harmless beyond a reasonable doubt, an error of constitutional dimension cannot have contributed to the verdict. *See Valdez v. State*, 124 Nev. 1172, 1189, 196 P.3d 465, 476 (2008).

28
(ECF No. 25-35 at 11.)

12

In a federal habeas case, where the state court has determined that a constitutional error was harmless beyond a reasonable doubt, as required by *Chapman v. California*, 386 U.S. 18 (1967), that harmless-error determination is reviewed for reasonableness under 28 U.S.C. § 2254(d). *See Davis v. Ayala*, 576 U.S. 257, 269 (2015) ("When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless the *harmlessness determination itself* was unreasonable.'" (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original)); *see also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (per curiam) (reviewing whether state court's determination of harmless error under *Chapman* was "objectively unreasonable" under § 2254(d)). If the federal habeas court determines that the state court's harmless-error analysis was objectively unreasonable, it then must determine whether the error was prejudicial under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), before it can grant relief. *See Fry*, 551 U.S. at 119-20. Under the *Brecht* standard, the Court may grant habeas relief only if it has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis*, 576 U.S. at 268 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). However, if the federal habeas court determines that the state court's *Chapman* harmlessness analysis was reasonable, that ends the inquiry. The federal court "need not go on to 'formally apply'" the *Brecht* test. *Id.*

Petitioner contends that his federal constitutional rights were violated because the trial court excluded evidence that the victim viewed internet pornography with a friend before Petitioner began having sex with her; he contends that exclusion of that evidence precluded him from presenting his defense and rendered his trial unfair. (ECF No. 41 at 22 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Davis v. Alaska*, 415 U.S. 308, 317 (1974); *Washington v. Texas*, 388 U.S. 14, 19 (1967)).) The Court reads the Nevada Court of Appeals' decision to rule that there was such a constitutional violation, but to conclude that the violation was harmless beyond a reasonable doubt. This Court determines that the Nevada Court of Appeals reasonably concluded that any federal

1   constitutional error was harmless beyond a reasonable doubt. As the Nevada Court of

2   Appeals explained, despite the exclusion of the evidence that the victim had viewed

3   internet pornography, Petitioner was able to present his defense and present evidence in

4   support of it. A fair-minded jurist could reasonably conclude that admission of the

5   evidence that the victim had viewed pornography would not have changed the jury's

6   verdict, and that its exclusion was harmless beyond a reasonable doubt. The Court will

7   deny Petitioner habeas corpus relief on Ground 2.

8       **D.    Ground 3**

9       In Ground 3, Petitioner claims that his federal constitutional rights were violated

10  because the trial court denied his challenges to alleged racially discriminatory peremptory

11  challenges of potential jurors by the prosecution. (ECF No. 19 at 15-19.) Petitioner alleges

12  that the prosecution used peremptory challenges in a racially discriminatory manner in

13  violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), in striking two prospective jurors,

14  Prospective Juror No. 31, an Asian American man, and Prospective Juror No. 52, an

15  African American woman. (*Id.*)

16      Petitioner asserted this claim on his direct appeal (ECF No. 25-17 at 23-27), and

17  the Nevada Court of Appeals ruled on the claim as follows:

18          …Guitron contends that under *Batson v. Kentucky*, 476 U.S. 79
            (1986), and its progeny, the State improperly used its peremptory
19          challenges to remove non-white venire persons from the jury pool in
            violation of Guitron's Fourteenth Amendment right to equal protection. We
20          disagree.

21          The United States Supreme Court has consistently held "that
            prosecutorial discretion cannot be exercised on the basis of race, *Wayte v.*
22          *United States*, 470 U.S. 598, 608 (1985), and that, where racial bias is likely
            to influence a jury, an inquiry must be made into such bias." *Powers v. Ohio*,
23          499 U.S. 400, 415 (1991) (emphasis added) (citing *Ristaino v. Ross*, 424
            U.S. 589, 596 (1976), and *Turner u. Murray*, 476 U.S. 28 (1986)); *Batson*,
24          476 U.S. at 95.

25          The three-pronged *Batson* test for determining whether illegal
            discrimination has occurred requires: (1) the opponent of the peremptory
26          strike to show a prima facie case of discrimination, (2) the proponent of the
            strike to provide a race-neutral explanation, and (3) the district court to
27          determine whether the proponent has "in fact demonstrated purposeful
            discrimination." *Diomampo v. State*, 124 Nev. 414, 422, 185 P.3d 1031,
28          1036 (2008) (citing *Batson*, 476 U.S. at 96-98). The reason for excluding a

juror under the second prong need not be either persuasive or plausible so long as it does not deny equal protection. *Id.* At the third prong, the district court must determine whether the opponent of the strike has met his burden of demonstrating the proponent's explanation is a pretext for discrimination. *See Conner v. State*, 130 Nev. [457], [463-66], 327 P.3d 503, 508-09 (2014), [*cert. denied*, 135 S.Ct. 2351 (2015)]. This burden is a heavy one. *See Hawkins v. State*, 127 Nev. [575], [578-79], 256 P.3d 965, 967 (2011) (discussing the Seventh Circuit's upholding of a preemptory strike despite the prosecution's "lame" race-neutral reason). The district court's factual findings regarding whether the proponent of a strike has acted with discriminatory intent is given great deference, *Diamampo*, 124 Nev. at 422-23, 185 P.3d at 1036-37, and we will not reverse the district court's decision "unless clearly erroneous," *Kaczmarek v. State*, 120 Nev. 314, 334, 91 P.3d 16, 30 (2004).

Here, the record indicates Guitron initially objected to the State's preemptory strike of Prospective Juror 31, an Asian male, and the district court initially determined Guitron had failed to make a prima facia case as to that juror. After the State exercised a preemptory challenge to excuse Prospective Juror 52, an African-American female, Guitron renewed his objection, arguing the State had exercised more than half of its preemptory challenges on minorities. The district court did not specifically find Guitron had established a prima facie case; instead, the court turned to the State for the race-neutral explanations. Under these circumstances we conclude the district court mooted the first step of the *Batson* analysis. *See Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006). *Cf. Watson v. State*, 130 Nev. [764], [779-80], 335 P.3d 157, 169 (2014) (discussing situations where the first *Batson* step is not mooted). It therefore fell to the State to provide a race-neutral explanation. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

The State indicated it had struck Juror 31 because he was a single father who automatically believes children. [Footnote: The record reflects that Juror 31 automatically believes children merely because they are children, and he articulated no reason for his tendency to believe children.] As to Juror 52, the State indicated it was currently prosecuting Juror 52 for a sex offense. The State further noted Juror 52 claimed she was molested when she was young and her daughters were also molested, but she did not think it appropriate to move forward with charges. Further, Juror 52 appeared more upset over being the victim of identity theft than over being molested. Following these explanations, Guitron acknowledged he had the burden to demonstrate these reasons were a pretext for discrimination. *See Conner*, 130 Nev. at [463-64], 327 P.3d at 508-09. To meet this burden, Guitron argued the State's failure to strike similarly situated jurors evinced pretext. The district court found the State's reasons to be race-neutral and rejected the *Batson* challenge.

The State's reasons were clear, reasonably specific, facially legitimate, and did not communicate any inherent discriminatory intent. *See id.* at [463-64], 327 P.3d at 508. The record reflects key differences between Jurors 31 and 52 and the jurors who were not struck by the State. [Footnote: Guitron argued Proposed Jurors 24 and 47 were similarly situated to Proposed Jurors 24 and 31. Juror 24, however, was not being prosecuted for a crime, and Juror 47 stated she would consider all of the evidence and try to be fair in weighing a child's testimony. We further note Guitron used a preemptory challenge to strike Proposed Juror 47 from the jury.] As

> Guitron was required to sufficiently demonstrate it was more likely than not the State acted with racially discriminatory intent or purpose, *id.* at [464], 327 P.3d at 509; *Kaczmarek,* 120 Nev. at 334, 91 P.3d at 30, Guitron failed to meet his burden and these differences undermine Guitron's argument and support the district court's finding. Under these facts, the district court did not err in denying the *Batson* challenges.

(ECF No. 25-35 at 20-23.)

In this Court, Petitioner focuses his argument on the comparison of the two prospective jurors at issue—Prospective Jurors No. 31 and 52—to other prospective jurors not stricken by the State, attempting to show that the Nevada Court of Appeals unreasonably determined that he did not show the State's asserted non-discriminatory reasons for the peremptory challenges to be pretextual. (ECF No. 41 at 28-29.) However, as the Nevada Court of Appeals pointed out, Prospective Juror No. 31's expressed tendency to believe children could reasonably be perceived as more troubling for the prosecution than that of Prospective Juror No. 47. (ECF Nos. 24-29 at 13-14; 24-29 at 10.) And, regarding Prospective Juror No. 52, it is reasonable to conclude that no other prospective juror identified by Petitioner had anywhere near the same combination of factors weighing against service on the jury that she had. (ECF Nos. 24-28 at 18-19 (Prospective Juror No. 52 was a victim of robbery; she was a victim of sexual molestation for years as a child; her two daughters were victims of sexual molestation for years as children); 19 (at the time of Petitioner's trial, there was an ongoing prosecution of Prospective Juror No. 52 for indecent exposure, with the charges reduced to disorderly conduct); 24 (molestation of Prospective Juror No. 52 was not reported to authorities; when Prospective Juror No. 52 was 15 years old, her 27-year-old boyfriend was prosecuted for statutory rape of her; she stated that "the sex was consensual"); 24-28 at 18 (Prospective Juror No. 6's sister's molestation; Prospective Juror No. 21's sister's molestation; Prospective Juror No. 24's sexual assault); 19 (Prospective Juror No. 113's wife's molestation (Prospective Juror No. 113 misidentified here as Prospective Juror No. 41); regarding the conviction of a Prospective Juror, without prospective juror number indicated, for misdemeanor involving domestic violence); 22 (regarding Prospective Juror No. 21's sister's molestation); 22-23 (regarding Prospective Juror No. 24's sexual

1   assault); 25 (regarding Prospective Juror No. 113's wife's molestation); 24-29 at 17, 25-

2   26 (regarding Prospective Juror No. 24's sexual assault); 24-28 at 20 (Prospective Juror

3   No. 6 removed for cause); 25 (Prospective Jurors No. 21 and 41 removed for cause).)

4        Taking into consideration the entire record of the jury selection, and especially the

5   questioning of the two prospective jurors at issue and the prospective jurors that Petitioner

6   compares them to, this Court finds that fair-minded jurists could reasonably conclude that

7   Petitioner did not show the State's peremptory challenges of Prospective Jurors No. 31

8   and 52 to be racially discriminatory. The Nevada Court of Appeals' ruling on this claim

9   was not contrary to, or an unreasonable application of *Batson*, or any other Supreme

10  Court precedent, and was not based on an unreasonable determination of the facts in

11  light of the evidence presented. The Court will deny Petitioner habeas corpus relief on

12  Ground 3.

13       **E.    Certificate of Appealability**

14       The standard for the issuance of a certificate of appealability requires a "substantial

15  showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court

16  has interpreted 28 U.S.C. § 2253(c) as follows:

17       Where a district court has rejected the constitutional claims on the merits,
         the showing required to satisfy § 2253(c) is straightforward: The petitioner
18       must demonstrate that reasonable jurists would find the district court's
         assessment of the constitutional claims debatable or wrong. The issue
19       becomes somewhat more complicated where, as here, the district court
         dismisses the petition based on procedural grounds. We hold as follows:
20       When the district court denies a habeas petition on procedural grounds
         without reaching the prisoner's underlying constitutional claim, a COA
21       should issue when the prisoner shows, at least, that jurists of reason would
         find it debatable whether the petition states a valid claim of the denial of a
22       constitutional right and that jurists of reason would find it debatable whether
         the district court was correct in its procedural ruling.
23

24  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074,

25  1077-79 (9th Cir. 2000).

26       Applying the standard articulated in *Slack*, the Court finds that a certificate of

27  appealability is unwarranted.

28  ///

1    **IV.    CONCLUSION**

2          It is therefore ordered that Petitioner's amended petition for writ of habeas corpus

3    (ECF No. 19) is denied.

4          It is further ordered that Petitioner is denied a certificate of appealability.

5          It is further ordered that the Clerk of the Court is directed to enter judgment

6    accordingly.

7          DATED THIS 11th Day of March 2021.

8

9    _____

10   MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE